**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **LANMARK TECHNOLOGY, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:06cv327** |
| | ) | |
| **ARTURO CANALES,** | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

In this diversity action for breach of contract and fraudulent misrepresentation, plaintiff,

Lanmark Technology, Inc. ("Lanmark"), alleges that its former employee, defendant Arturo

Canales, (i) breached a non-compete clause in his employment agreement and (ii) fraudulently

induced Lanmark to hire him based on misrepresentations of his educational experience.  Chiefly

at issue on summary judgment is (a) whether Lanmark's non-compete clause is fatally overbroad,

and hence unenforceable under Virginia law and, if not (b) whether Canales violated the clause

when he accepted an employment offer that required him to work under a contract with

Lanmark's former client, the Defense Logistics Agency ("DLA").

**I.**[1]

Lanmark, a Virginia corporation headquartered in Fairfax, Virginia, provides information

technology services, program management oversight, and administrative support to clients in the

---

[1]The facts recited here are derived from the record as a whole, pursuant to Rule 56, Fed. R. Civ. P.  The facts recited herein are largely undisputed.  Where disputes exist, they are noted and, if material, the facts are construed favorably to plaintiff, as required.  *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

federal government and commercial sectors.  According to Lanmark's website,[2] included within

these broadly-framed categories of services are the following specific services:

- <u>Information Technology Services:</u> software development, software testing, software quality assurance, software configuration management, web design and development, audio/visual technical support, system design and data integration, data interoperability, network engineering and maintenance, information technology operations and helpdesk support, net-centric enterprise services, knowledge management systems, and database and application development;

- <u>Program Management Services:</u> program/project analysis and support, conference management support, training development and support, logistical planning and support, and resource planning;

- <u>Administrative Support Services:</u> program and personal support, finance, budgeting and accounting services, library science and information management, contract support, inventory management, warehousing services, file/records digitization, and management and maintenance.

By any measure, this is an exceptionally broad range of diverse services that Lanmark purports to

offer government and commercial customers.

Canales, a Tennessee citizen and resident, claims to have twenty years of experience in

military contracts, technology services, and project management.  Additionally, he claims to have

earned both a bachelor's and master's degree in engineering from Columbia State University.

Lanmark hired Canales, in June 2004, as a project manager at an annual salary of

$92,000.  Lanmark claims it hired Canales based, at least in part, on Canales's representation that

he had received two engineering degrees from Columbia State University.  There is, as it turns

out, an issue as to whether Columbia State University is a "diploma mill" that provides "bogus

---

[2]http://www.lmt-inc.com/services.asp.

degrees" or a genuine educational institution.[3]  Lanmark asserts that Columbia State University is

a diploma mill, that Canales knew this when he applied for a position at Lanmark, and that

Canales intentionally misrepresented his education at Columbia State University to induce

Lanmark to hire him.  Canales vigorously disputes this claim, contending that he believed then,

as he does now, that his degrees are genuine.  In any event, this dispute is immaterial to the

dispositive issue of the enforceability of the non-compete clause.

From June 2004 until November 2004, Canales worked on projects related to the contract

between Lanmark and DLA (the "Lanmark-DLA contract"), in which Lanmark performed an

inventory audit of DLA's assets.  Two DLA representatives in charge of the Lanmark-DLA

contract, John Frankenberger and Danny Lester, testified that Canales was knowledgeable and

performed his duties in a satisfactory and professional manner.  Despite DLA's satisfaction with

Canales's work, Lanmark now contends that Canales did not meet either DLA's or Lanmark's

expectations.  Certain undisputed facts reflect otherwise.  To begin with, DLA representatives, as

noted, praised Canales's work and gave no indication they were dissatisfied with his

performance.[4]  The evidence also suggests that Lanmark was satisfied with Canales's

performance.  In mid-July 2004, Lanmark gave Canales a 4% raise (amounting to $4,000),

increasing his annual salary to $96,000, and increasing his vacation time from 80 hours (two

weeks) per year to 120 hours (three weeks) per year.  Finally, when the Lanmark-DLA contract

---

[3]*Bogus Degrees and Unmet Expectations: Are Taxpayer Dollars Subsidizing Diploma Mills?: Hearings Before the S. Comm. on Gov. Affairs*, 108th Cong. 4, 20 (2004) (statement of Sen. Susan M. Collins, Chairman, S. Comm. on Gov. Affairs).

[4]Specifically, Frankenberger also testified he was excited that Canales would be working on a different DLA project with his new employer because he "was impressed with [Canales's] capabilities from [the Lanmark-DLA] contract."

was completed, DLA, as a satisfied customer, paid Lanmark the full amount due under the contract.

In October 2004, only a month before he was terminated, Canales signed a Non-disclosure/Noncompete Agreement that included the following clause at issue here:

> Employee shall not, for a period of two years following termination of employment with the Company, assist, as an employee or otherwise, any competitor to [Lanmark] to obtain business opportunities to perform services similar to those provided by [Lanmark] that relates to (1) a contract or project being performed by [Lanmark], (2) a business opportunity that [Lanmark] is pursuing, or (3) a person or organization for whom [Lanmark] has provided or is providing services.

The agreement further provided that Virginia law would govern all disputes arising under its terms.

In November 2004, after only five months of employment, Lanmark terminated Canales's employment for reasons not stated in the record. Following his termination, Canales returned to work for his pre-Lanmark employer, PC Mall, in Memphis, Tennessee. While working at PC Mall, Canales accepted employment with CrystalView Technology Corp. ("CrystalView"), which has a contract with DLA's Cooperative Administrative Support Unit[5] (the "CrystalView-CASU contract") that requires it to perform management and oversight services for DLA. Significantly, Canales's work on the CrystalView-CASU contract differs from the work he performed under the Lanmark-DLA contract. Specifically, the Lanmark-DLA contract required Canales "to do an inventory and to apply barcodes to assets and to review documentation and to create replacement documentation when it [did not] exist." By contrast, the CrystalView-CASU contract requires that Canales "support the [Immediate Response Team], attend meetings,

---

[5]The acronym for this unit is CASU. *See* www.dla.mil/acronyms/default.pdf.

maintain a [Plan of Action and Milestones] for both DLA and [the Department of Defense] in a support role and help review scheduling of ongoing efforts."   Thus, as Frankenberger testified, the two contracts do not involve "the same sort of functions at all."   Importantly, it is undisputed that Canales did not "assist" CrystalView with any contract proposals or otherwise help CrystalView to solicit, negotiate, or obtain the CrystalView-CASU contract.   The parties dispute, however, whether, at the time of CrystalView's employment offer, Canales was aware that CrystalView had a contract with the CASU that would require him to perform services for DLA.

On February 21, 2006, Lanmark filed suit in the Circuit Court for Fairfax County, Virginia, alleging that Canales (i) breached his employment agreement (a) by failing to return Lanmark property upon his termination and (b) by competing with Lanmark in violation of the non-compete clause; and (ii) misappropriated trade secrets.   On March 28, 2006, Canales, pursuant to 28 U.S.C. § 1446, filed a notice of removal to the Eastern District of Virginia based on diversity jurisdiction.   In June 2006, Lanmark amended its complaint omitting the claim of misappropriation of trade secrets, and asserting instead a claim for fraudulent misrepresentation. Thereafter, on August 16, 2006, Canales filed a motion for summary judgment contending (i) that the non-complete clause is unenforceable because it is functionally and geographically overbroad and (ii) that even if enforceable, Canales did not violate the clause because he did not assist CrystalView in obtaining the CrystalView-CASU contract.

## II.

The summary judgment standard is too well-settled to require elaboration here.   In essence, summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.   *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). And, importantly, to defeat summary judgment the non-moving party may not

rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue

for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.

The central, dispositive issue on summary judgment is whether Lanmark's non-compete

clause is unenforceable under Virginia law.[6] In Virginia, as elsewhere, non-compete clauses are

disfavored restraints on trade.[7] Virginia courts take this view because covenants not to compete,

by their nature, restrain competition, and accordingly curb the "fundamental right of individuals

to seeks success in our free-enterprise society."[8] Given that such non-compete covenants are

---

[6]The parties correctly agree that Virginia law governs this action. This is so because (i) this is a diversity action governed by forum state law, including forum choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); (ii) the parties have contractually chosen Virginia law; and (iii) Virginia law gives effect to parties' reasonable contractual choice of law provisions, *Bryant Elec. Co. v. City of Fredericksburg*, 762 F.2d 1192, 1196 (4th Cir. 1985) (stating that Virginia courts "have held that contracting parties may by agreement choose what law will govern their contract").

[7]*See, e.g., Simmons*, 544 S.E.2d at 678. *Construction Materials v. Kirkpatrick Concrete,* 631 So.2d 1006, 1009 (Ala. 1994); *DeCristofaro v. Security Nat'l Bank*, 664 P.2d 167, 169 (Alaska 1983); *Norlund v. Faust*, 675 N.E.2d 1142, 1154 (Ind. App. 1997); *BFI-Portable Services, Inc. v. Kemple*, 1989 Minn. App. LEXIS 1232, at *6 (Minn. Ct. App. 1989) (unpublished); *American Broadcasting Companies, Inc. v. Warner Wolf*, 420 N.E.2d 363, 367-68 (N.Y. 1981); *Single Source Packaging, LLC v. Cain*, No. 2003-CA-14, 2003 Ohio App. LEXIS 4248, at *17 (Ohio Ct. App. 2003); *Outfitters Satellite, Inc. v. CIMA, Inc.*, No. M2003-02074-COA-R3-CV, 2005 Tenn. App. LEXIS 86, at *5 (Tenn. Ct. App. 2005); *Morse Wholesale Paper Co. v. Talley*, No. 14-05-01180-CV, 2006 Tex. App. LEXIS 7196, at *5 (Tex. App. 2006); Restatement (Second) of Contracts § 188 (1981).

[8]15-80 *Corbin on Contracts* §§ 80.1, 80.4 (2006) (stating that in entering into a covenant not to compete, "[t]he parties' purpose is to impose a restraint upon the trade or commerce of third persons only insofar as being deprived of the opportunity to trade with the party to the contract who has voluntarily agreed to be restrained. In every case, the promisee's purpose, without doubt, is to rid itself of the competition of the promisor"); *see also Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289 (Va. 1992) (stating that because a covenant not to

disfavored in Virginia, they "have been upheld only when employees are prohibited from competing directly with the former employer or through employment with a direct competitor." *Omniplex World Servs. Corp. v. U.S. Investigations Servs. Inc.*, 618 S.E. 2d 340, 342 (Va. 2005). With respect to employment with a direct competitor, non-compete clauses that "restrict the former employee's performance of functions for his new employer [are upheld] only to the extent that the proscribed functions are the *same* functions as were performed for the former employer." *Cantol, Inc. v. McDaniel*, No. 2:06cv86, 2006 U.S. Dist. LEXIS 24648 at *14 (E.D. Va. April 28, 2006) (*citing Omniplex*, 618 S.E. 2d at 342) (emphasis added).

Consistent with these general principles, the Supreme Court of Virginia has established a three-part test to measure the enforceability of non-compete clauses.  This test requires that the employer show that the clause (i) is narrowly drawn to protect the employer's legitimate business interest; (ii) is not unduly burdensome on the employee's ability to earn a living; and (iii) is not against sound public policy.  *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962).  In particular, the analysis of these interrelated factors "requires consideration of the restriction in terms of function, geographic scope, and duration."  *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001).  Importantly, courts applying this three-part test must take the non-compete provision as written; there is no authority for courts to "'blue pencil' or otherwise rewrite the contract" to eliminate any illegal overbreadth.  *See Pais v. Automation Products, Inc.*, 36 Va. Cir. 230, 239 (1995).  Thus, where a non-compete clause is ambiguous, that is, it is susceptible to two or more

---

compete "restricts the employee in the exercise of a gainful occupation, it is a restraint in trade, and it is carefully examined and strictly construed") (citations omitted)).

differing interpretations,[9] one of which is functionally overbroad, and thus unenforceable, the clause fails even though it may be reasonable as applied to the specific circumstances presented. *See id.* at 57-58.[10]  To hold otherwise would amount to a "blue-penciling" of the contract and would permit an "*in terrorem* effect on an employee, who must try to interpret the ambiguous provision to decide whether it is prudent, from a standpoint of possible legal liability, to accept a particular job or whether it might be necessary to resist plaintiff's efforts to assert that the provision covers a particular job." *Id.* (*citing Meissel v. Finley*, 95 S.E.2d 186, 188 (Va. 1956)). As one trial court put it, an employer may try to limit the *in terrorem* effect of an ambiguous non-compete clause by interpreting it narrowly, but such a "request for limited relief cannot cure what is otherwise a defective non-competition agreement." *Cliff Simmons Roofing, Inc.*, *Inc. v. Cash*, 49 Va. Cir. 156, 158 (Va. Cir. 1999).

The three-part enforceability test, applied here, compels the conclusion that Lanmark's non-compete clause is functionally overbroad, and hence, unenforceable.  The first step in the analysis is to assess whether the clause is narrowly drawn to protect Lanmark's legitimate business interest.  *See Richardson*, 127 S.E.2d at 117.  To be sure, Lanmark has a legitimate business interest in imposing a reasonable non-compete clause, namely that such a clause would be necessary "to protect itself from losing potential work to competitors through employees who

_____

[9]*See Lawrence v. Business Communications of Virginia, Inc.*, 53 Va. Cir. 102, 104 (2000) (stating that if one provision "considered in the context of the other language used in the contract, is capable of more than one reasonable construction, it is ambiguous").

[10]It is worth noting that in examining a non-compete clause it is unnecessary to "determine the exact reach of the covenant in order to conclude that is overbroad.  The fact that it is so difficult to determine and may so easily exceed in effect the permissible reach renders the covenant overbroad." *Powers Distrib., Inc. v. Emergency Power Eng'g.*, 569 F. Supp. 54, 57-58 (E.D. Va. 1983) (applying Virginia law).

leave the company and then compete against [Lanmark] using the business sensitive knowledge and contacts they acquired" as an employee. *See Power Distrib.*, 569 F. Supp. at 57 (finding that employer had a legitimate business interest in protecting itself from competition by former employees who had gained sensitive information).

Yet the proffer of a legitimate business interest to support a non-compete clause only begins the analysis because the specific non-compete clause in issue must also be "reasonable in the sense that it is no greater than is necessary to protect" an employer's legitimate business interest. *Richardson*, 127 S.E.2d at 117.  Lanmark's clause fails this test.  It is functionally overbroad.  Specifically, Canales cannot assist a competitor of Lanmark to obtain any business opportunity, to perform any services similar to services performed by Lanmark, that relates to (i) any contract or project currently being performed by Lanmark, (ii) any business opportunity Lanmark is pursuing, and (iii) any person or organization for which Lanmark is or has provided services.[11]  By any measure, this restriction is breathtakingly and excessively broad.  Lanmark itself confirms this conclusion by conceding that the intent of the agreement is to "prohibit Defendant from competing against [Lanmark] with [Lanmark's] customers, regardless of which of the services that [Lanmark] performs Defendant is providing to [Lanmark's] customers."  Put simply, the clause prohibits a former employee from *any* form of employment with a competitor, including work *unrelated* to the employee's work at Lanmark.  In this respect, the non-compete clause far exceeds Lanmark's legitimate interest in protecting itself from employees that use

_____

[11]It is worth noting that the employment agreement does not define a "competitor" of Lanmark, a "business opportunity," "services" Lanmark performs, "similar" services to Lanmark, when Lanmark is "performing" a contract or service, and when Lanmark is "pursuing" a business opportunity.

"business sensitive knowledge and contacts they acquired" at Lanmark. To illustrate this point, it is clear that the non-compete clause, as construed by Lanmark, would prohibit Canales from assisting CrystalView should it seek to win a library sciences services contract because Lanmark provides such services. *See, supra,* at 2. And, this result obtains even though Canales (i) was never involved in Lanmark's library science services function; (ii) did not acquire business sensitive knowledge regarding Lanmark's library sciences services; and (iii) did not acquire any library sciences services contacts while at Lanmark. Nor is this the only example of the clause's overbreadth; again, construed as Lanmark argues, the non-compete clause is even more far-reaching because it prohibits Canales from assisting CrystalView in winning a janitorial services contract if Lanmark were to "pursue" janitorial services contracts at any time within two years of Canales's termination. And, again, this result obtains even though Lanmark never provided janitorial services during Canales's employment and even though Canales could not therefore have acquired any business sensitive knowledge or contacts regarding Lanmark's janitorial services function.

Virginia courts have appropriately and consistently prohibited such overly-broad non-compete clauses.[12] Thus, where, as here, the non-compete clause effectively prohibits the

---

[12] *See Cantol, Inc. v. McDaniel*, No. 2:06cv86, 2006 U.S. Dist. LEXIS 24648 at *14 (E.D. Va. April 28, 2006) (stating that non-compete clauses that "restrict the former employee's performance of functions for his new employer [are upheld] *only* to the extent that the proscribed functions are the *same* functions as were performed for the former employer" ) (emphasis added); *see, e.g.*, *Cliff Simmons Roofing Inc.*, 49 Va. Cir. at 157 (invalidating a roofing company's non-compete agreement that would prohibit employee from working for another roofing company "even if he were to be employed in a position in which he could not utilize confidential information and in which he did not play a role in competing with his former employer, e.g., as a janitor for a local roofing company, as a stock clerk for a local roofing company, etc."); *Totten v. Employee Benefits Mgmt., Inc.*, 60 Va. Cir. 342, 344 (Va. Cir. 2002) (invalidating contract that "effectively prevents the Plaintiff from working in a non-competing field if employed by a

employee from working in virtually any capacity for a competitor, it is not narrowly drawn to protect the employer's legitimate business interest, and thus, is functionally overbroad.

For related reasons, the non-compete clause also fails the second prong of the enforceability test because it unduly burdens Canales's ability to earn a living. *Richardson*, 127 S.E.2d at 119. As previously noted, the non-compete clause does not define several key terms, including: "competitor," "business opportunity," "services," "similar" services, "perform," and "pursuing." These terms are capable of more than one reasonable construction, and thus, are ambiguous. *See Lawrence,* 53 Va. Cir. at 104 (*citing Paramount Termite Control Co. v. Rector*, 380 S.E.2d 922, 925-26 (Va. 1989)). To be sure, these terms could be interpreted to limit the reach of the non-compete clause. For example, the terms could be construed to limit sharply the scope of the clause to prohibit Canales from using only the confidential information or business contacts he acquired while employed at Lanmark to assist an obviously competitive company obtain a business opportunity that usurps a contract or service Lanmark is currently performing. As noted, however, the provision, as written, may also be construed to prohibit much more. As Lanmark suggests, the non-compete clause prohibits Canales from accepting any job with an employer that competes with Lanmark, whether or not Canales's job entails providing services that compete with Lanmark or utilizing business sensitive information acquired from Lanmark. Because the non-compete clause is ambiguous and susceptible to two or more differing interpretations, at least one of which is functionally overbroad, the clause is unenforceable. *See Lawrence,* 53 Va. Cir. at 104.

---

competitor"), *Cantol*, 2006 U.S. Dist. LEXIS at *17 (invalidating clause where "Plaintiff has overstepped the permissible limits of covenants not to compete by defining competition to encompass more than the functions that [the employee had] performed for Plaintiff").

It is of no consequence that Lanmark asserts that it only intends to enforce the non-compete clause to prevent Canales from competing directly with Lanmark or assisting others to compete directly with Lanmark because a "request for limited relief cannot cure what is otherwise a defective non-competition agreement." *Cliff Simmons Roofing, Inc.*, 49 Va. Cir. at 158.[13]   Put another way, the contract must be interpreted as written; there is no authority to "'blue pencil' or otherwise rewrite the contract." *Pais*, 36 Va. Cir. at 239.  Given this, it follows that the non-compete clause, as written, is ambiguous and unreasonably burdens Canales's opportunities to choose employment and earn a living.  Under Virginia law, subjecting an employee to such uncertainty offends sound public policy and thus runs afoul of the third part of the enforceability test.  *See Power Distrib., Inc.*, 569 F. Supp. at 57-58 (*citing Meissel*, 95 S.E.2d at 188).

From the foregoing analysis, it is clear that the non-compete clause is functionally overbroad and unenforceable under Virginia law.  Accordingly, Canales's motion for summary judgment on the breach of contract claim must be granted.[14]

---

[13]As one Virginia court explained, this is a sound result because an overly ambiguous covenant is "akin to an amoeba.  By having a life wholly unto itself, this covenant may grow more oppressive without restriction day by day, week by week, month by month, or year by year." *Lawrence*, 53 Va. Cir. at 103-04.  Thus, if the ambiguity apparent on the face of the instrument belies the employer's assertion that the clause is intended to prohibit a limited amount of competitive activity, then the non-compete clause is unenforceable.

[14]Given this result, it is unnecessary to address whether the clause might also be geographically or temporally overbroad.  Even so, it is worth noting that the non-compete clause does not appear to be unenforceable on these grounds.  In general, non-compete clauses are not overbroad if they relate to the geographic area covered or serviced by the employer.  *See Roanoke Eng'g Sales Co. v. Rosenbaum*, 290 S.E.2d 882 (Va. 1982).  Thus, to the extent that Lanmark is a national company, the absence of a geographic limitation does not *per se* invalidate the non-compete clause.  Moreover, Canales, quite correctly, does not dispute the temporal limitation of two years because Virginia courts have upheld restrictive covenants containing longer terms.

An appropriate Order will issue.


                                                        ___/s/_____
Alexandria, Virginia                                    T. S. Ellis, III
September 29, 2006                                       United States District Judge

---

*See, e.g.*, *Meissel,* 95 S.E. 2d at 190 (upholding non-compete clause with a five year term).